# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| KEYRON THOMAS, | ) | Case No. 1:25-cv-45 |
| | ) | |
| Plaintiff, | ) | Judge J. Philip Calabrese |
| | ) | |
| v. | ) | Magistrate Judge |
| | ) | Jennifer Dowdell Armstrong |
| CORRECTIONAL OFFICER | ) | |
| KUNEZ, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## OPINION AND ORDER

Plaintiff Keyron Thomas, a pretrial detainee at the outset of this case who now resides at the Trumbull Correctional Institution, filed this action without a lawyer against Officer Kuntz (incorrectly spelled as Kunez on the docket) and Officer Adams in their official capacities and against the Cuyahoga County jail.  The complaint alleges violations of State law and Mr. Thomas's federal civil rights under Section 1983 for incidents that allegedly occurred during his pretrial detention at the jail.  The parties filed cross-motions for summary judgment.  For the following reasons, the Court **GRANTS IN PART** Defendants' motion for summary judgement and **DENIES** Plaintiff's motion for summary judgment.

## STATEMENT OF FACTS

On cross-motions for summary judgment, the Court construes the facts in Plaintiff's favor in ruling on Defendants' motion for summary judgment, and in Defendants' favor in ruling on Plaintiff's motion for summary judgment.

At issue are two separate incidents.  First, on November 2, 2024, Mr. Thomas alleges that he was assaulted by two fellow inmates, resulting in a broken nose, medical complications, and an alleged loss of purchased commissary items.  (ECF No. 1, PageID #5; *see* ECF No. 32-4, PageID #350.)  Second, from December 19, 2024, to December 24, 2024, Mr. Thomas fell ill and alleges that Officers Kuntz and Adams denied him care.  (ECF No. 1, PageID #5.)  Mr. Thomas submitted minimal evidence (beyond the complaint) to support his claims.  But the record, including evidence submitted by Defendants, establishes the following facts.

### A.    The November Incident

On November 2, 2024, Mr. Thomas was assaulted by fellow inmates, which resulted in a broken nose.   (ECF No. 30-1, PageID #277–78.)  Corrections Officers Adams and Kuntz were not on shift during this incident and not otherwise involved. (*Id.*, PageID #275.)  Different officers were working at the time.  (*Id.*)

Staff at the MetroHealth Emergency Department evaluated Mr. Thomas the same day, diagnosed him with a fractured nasal bone, discharged him back to the jail, and prescribed Tylenol and similar pain medication.  (ECF No. 35-1, PageID #430.) The next day, Mr. Thomas submitted a health care grievance form complaining of pain.  (ECF No. 32-4, PageID #351.)  On November 4, 2024, the corrections health staff examined Mr. Thomas and prescribed him Motrin for the pain.  (ECF No. 35-1, PageID #453.)

Mr. Thomas alleges that, while he was hospitalized, corrections staff lost his property.  (ECF No. 1, PageID #12; *see* ECF No. 32-4, PageID #350.)  His complaint does not specify what property was lost, but a grievance filing on the same day as the

2

hospital visit indicates that the property at issue consisted of food he had purchased from the commissary.  (ECF No. 32-4, PageID #350.)

### B.    The December Incident

About a month and a half after the attack, Mr. Thomas fell ill.  (ECF No. 30-1, PageID #246.)  He asserts that while he was sick the corrections personnel denied him access to medical treatment.  (ECF No. 1, PageID #12, #14–18; *see* ECF No. 30-1, PageID #244–48.)  According to Mr. Thomas, his "throat was clogging up when [he] ate [his] food." (ECF No. 30-1, PageID #249.)  Based on his trouble eating, corrections officers allegedly called medical staff.  (*Id.*)  But Mr. Thomas claims that the medical staff never came to get him.  (*Id.*)

Mr. Thomas alleges black mold caused his illness.  (ECF No. 1, PageID #5.)  However, he later conceded that he was never diagnosed with a mold-related illness and that Officers Kuntz and Adams did not expose him to the mold.  (ECF No. 30-1, PageID #274.)  Further, an affidavit from a health and safety manager at the jail indicates that he inspected the areas around Mr. Thomas's facility in both November and December 2024, but did not note any presence of black mold. (ECF No. 33, PageID #370–71.)

Because the December incident took place over several days, the Court outlines the relevant events below.

### B.1.    December 19, 2024 to December 21, 2024

Mr. Thomas first asked officers to call medical staff on December 19, 2024. (ECF No. 30-1, PageID #255.)  According to the medical records, a nurse saw Mr. Thomas that same day for facial dryness and prescribed medication.  (ECF

3

No. 35-1,  PageID #449.)   During  that  appointment,  there  is  no  indication  that Mr. Thomas  mentioned  a  sore  throat  or  other  related  issues.   (*Id.*; ECF  No.  30-1, PageID #255.)  Nothing in the record indicates the status of Mr. Thomas on December 20, 2024, but the logbook for the following day labeled his condition as "good."  (ECF No. 34-2, PageID #397.)

### B.2.   December 22, 2024

Early  on  the  morning  of  December  22,  2024,  the  corrections  officer  logbook indicates  that  an  officer  called  medical  staff  to  speak  with  a  nurse  about Mr. Thomas's "bad back."  (*Id.*, PageID #401.)  The logbook further indicates that the nurse would "make [Mr. Thomas] an appointment to be seen by a doctor."  (*Id.*)

About four and a half hours later, Mr. Thomas filed an initial grievance about his  medical  care  using  the  inmate  healthcare  grievance  form.   (ECF  No.  32-4, PageID #354.)  In the grievance form, Mr. Thomas complained that the medical staff were not adequately addressing his concerns and made a request to see a doctor.  (*Id.*) The grievance did not specify a sore throat but rather concerned other pain.  (*Id.*) However, the grievance did acknowledge that the corrections officers were contacting the medical staff for Mr. Thomas.  (*Id.*)

The next day, a reply to the grievance informed Mr. Thomas that he had an upcoming primary care appointment.  (*Id.*)  Contemporaneous with the filing of the initial grievance, an officer wrote in his logbook that medical staff was called on behalf of Mr. Thomas and indicated that medical "will have to look at his chart and speak to a charge nurse to see what can be done."  (ECF No. 34-2, PageID #405.)  A nurse arrived in the area with a medical cart less than two hours later.  (*Id.*)

4

The nurse met with Mr. Thomas, who specifically complained of a sore throat and indicated that he "cannot hardly swallow." (ECF No. 35-1, PageID #447.) Also, Mr. Thomas "[r]efused the Motrin at this time because he said it hurts when he swallows." (*Id.*; *see* ECF No. 30-1, PageID #256.)

According to Mr. Thomas he had been having a problem with his throat "off and on for a little while" but did not think it was serious until he started struggling to swallow. (ECF No. 30-1, PageID #255.) Further, the medical records indicate that a charge nurse informed a certified nurse practitioner that Mr. Thomas complained of a "sore throat," was "able to swallow but [had] soreness," and the nurse planned to perform a strep test on Mr. Thomas. (ECF No. 35-1, PageID #447.) Later in the day, a doctor visited Mr. Thomas to perform a strep test; however, Mr. Thomas refused because he did not know that a sore throat was a symptom of strep throat. (ECF No. 30-1, PageID #256–57.)

In the evening, a corrections officer informed the nurse that Mr. Thomas did not go to the medical cart for his pain medicine. (ECF No. 35-1, PageID #447.) Further, the corrections officer noted that Mr. Thomas did not inform the officers that his throat hurt and that he ate his dinner. (*Id.*) Mr. Thomas, however, disputes that he ate his dinner and accuses the officer on duty of lying to medical staff about him eating his dinner. (ECF No. 30-1, PageID #258.) According to Mr. Thomas, he did not eat breakfast, lunch, or dinner on the days the officers said he did. (*Id.*, PageID #251.)

Officer Kuntz began his shift on December 22, 2024 at 6:00 p.m. and was on duty until 10:00 p.m.  (ECF No. 34-2, PageID #407.)  Officer Kuntz did not receive a briefing at the beginning of shift or any information related to Mr. Thomas and his ailments.  (*Id.*)  Mr. Thomas claims that he spoke to Officer Kuntz during his shift about his illness (ECF No. 30-1, PageID #250), but Officer Kuntz did not note anything about Mr. Thomas in his logbook for that shift (ECF No. 34-1. PageID #407–08).  According to Mr. Thomas, Officer Kuntz called medical and was told that Mr. Thomas was lying about being sick.  (ECF No. 30-1, PageID #250.)

### B.3.    December 23, 2024 to December 24, 2024

Early in the morning on December 23, 2024, the officer logbook noted that Mr. Thomas reported intense body pain to the officer on duty and that medical was called.  (ECF No. 34-2, PageID #412.)  Although nurses were in Mr. Thomas's pod area twice on December 23, 2024, in the morning and the afternoon, there is no indication that they saw or examined Mr. Thomas.  (*Id.*, PageID #413.)

Officer Adams assumed duty later in the day (ECF No. 30-1, PageID #249) and was on shift from 6:00 p.m. to 10:00 p.m. (ECF No. 34-2, PageID #415).  Once on shift, Mr. Thomas complained to Officer Adams about his pain.  (ECF No. 30-1, PageID #249.)  Also, Mr. Thomas claimed that his throat was "clogging up" whenever he ate. (*Id.*)  Therefore, Mr. Thomas asked Officer Adams to go to medical.  (*Id.*)  However, there is nothing in the logbook from Officer Adams about Mr. Thomas's complaints or whether he was seen by medical staff.  (ECF No. 34-2, PageID #415.)

On December 24, 2024, about two hours after Officer Adams was relieved of his shift, the new officer on duty called medical for Mr. Thomas.  (*Id.*, PageID #416;

6

ECF No. 35-1, PageID #446.)  Mr. Thomas was seen by medical shortly after.  (*Id.*) He informed medical staff that his throat started hurting "after he cracked his neck and he woke up feeling like he couldn't breath[e] or swallow." (ECF No. 35-1, PageID #446.) Medical staff noted that Mr. Thomas's exam revealed that he was able to "swallow without difficulty or grimacing" and they placed him on a follow-up list.  (*Id.*)

Seven hours later, Mr. Thomas returned to medical.  (*Id.*)  This time, Mr. Thomas complained that he was having an allergic reaction to a chicken patty he ate the previous night.  (*Id.*)  Medical staff noted that Mr. Thomas had a low-grade fever and had a sore throat for three days but no sign of a rash or shortness of breath. (*Id.*)  Doctors ordered a strep test but, upon noting that his left tonsil was swollen, elected to transfer Mr. Thomas to an outside hospital to rule out a peritonsillar abscess.  (*Id.*)

Mr. Thomas was taken to a local emergency room, where it was determined that he had strep throat, and his tonsil would need to be drained by a specialist.  (*Id.*, PageID #428.)  The examining physician noted that Mr. Thomas was calm and cooperative during the examination, there were no signs of acute distress, and his breathing was unlabored.  (*Id.*)  The emergency room elected to transfer Mr. Thomas to MetroHealth, where the specialist drained his abscess.  (*Id.*, PageID #426.) According to Mr. Thomas, he was given medicine for the strep throat and a follow-up appointment was scheduled.  (ECF No. 30-1, PageID #265.)

## C.    Grievances and Appeals

Upon his arrival at the Cuyahoga County jail, Mr. Thomas received a copy of the inmate handbook.  (ECF No. 30-1, PageID #244.)  The inmate handbook contains

7

the grievance procedure that inmates must follow, including the procedure for general grievances and medical grievances.  (ECF No. 32-3, PageID #329–30 & #339–40.) Mr. Thomas indicated that he understands the grievance procedure.  (ECF No. 30-1, PageID #244.)

During his pretrial detention, Mr. Thomas filed a multitude of grievances between November 2024 and mid-January 2025, including four general grievances and eleven healthcare grievances.  (ECF No. 32-5, PageID #365–66.)  By the close of discovery in this case, all the healthcare grievances had either been passively or actively accepted.  (*Id.*)  Of the remaining four general grievances, one was accepted, one was still awaiting assignment, and two were completed with an objection.  (*Id.*) The general grievance awaiting assignment, which has yet to be responded to, was filed on November 2, 2024.  (ECF No. 32-4, PageID #350.)  In that grievance, Mr. Thomas complained about commissary that was lost during his visit to the emergency room for his broken nose because of the assault.  (*Id.*)  Five days later, Mr. Thomas filed another general grievance raising the same complaint.  (*Id.*, PageID #352.)  Mr. Thomas updated this grievance roughly thirteen months later in December 2025 to complain that no one ever responded to the original grievance.  (*Id.*) The corrections staff responded the same day as the update informing Mr. Thomas that the commissary would not reimburse him for any lost property that was purchased more than 30 days ago.  (*Id.*)  This grievance is now considered complete and notes Mr. Thomas's objection that no one responded to the grievance.  (ECF No. 32-5, PageID #366.)

Mr. Thomas filed a third general grievance a month after his initial one in December 2024.  (ECF No. 32-4, PageID #356.)  This time, Mr. Thomas requested the identity of the corrections officers who worked the days he was in the hospital getting his tonsil drained.  (*Id.*)  Corrections staff responded to the grievance twelve days later and asked Mr. Thomas if he had spoken with a corporal.  (*Id.*)  Mr. Thomas accepted this response.  (ECF No. 32-5, PageID #365.)

The underlying content of the remaining general grievance with an objection, filed on December 28, 2024, was a complaint related to the general medical care Mr. Thomas received in the preceding weeks, without specifically identifying the medical treatment to which he referred.  (*Id.*, PageID #359.)  Corrections staff responded two days later and forwarded Mr. Thomas's complaint to nursing management.  (*Id.*) Mr. Thomas appealed this answer.  (*Id.*)  In doing so, he claimed that various corrections and medical staff, including Officers Kuntz and Adams, should be held accountable and "start taking people['s] medical care more serious." (*Id.*)  Three days later, Mr. Thomas updated the appeal and alleged that he was exposed to black mold.  (*Id.*)  Corrections staff responded the same day as the update informing Mr. Thomas that the corrections staff "does not direct the medical staff in medical matters." (*Id.*)  Mr. Thomas did not appeal this response.  (*Id.*)

## STATEMENT OF THE CASE

Based on these events, Mr. Thomas filed a complaint under 42 U.S.C. § 1983 against Officers Kuntz and Adams in their official capacities and against the corrections facility itself.  (ECF No. 1, PageID #2–3.)  Additionally, Mr. Thomas

9

asserts State-law claims for dereliction of duty under Sections 2921.44 and 2921.45 of the Ohio Revised Code. (*Id.*, PageID #16.)

The Court held a case management conference and set deadlines for the case, including a fact discovery deadline. (ECF No. 22.) Then, the Court referred the matter to the Magistrate Judge to hear and decide all non-dispositive pretrial matters. (ECF No. 23.) Defendants sought leave to depose Mr. Thomas. (ECF No. 24), which the Magistrate Judge granted (Order, Dec. 1, 2025). In response, Mr. Thomas filed a "Motion to Ignore any request from the Defendants" (ECF No. 26), which the Magistrate Judge denied (Order, Dec. 19, 2025). In discovery, Mr. Thomas filed a single motion: "Motion to Release Documents." (ECF No. 27.) The Magistrate Judge denied this motion because Mr. Thomas did not timely request production of documents from Defendants and did not confer with Defendants before filing the motion as required. (Order, Mar. 5. 2026.)

At the close of discovery, Defendants and Mr. Thomas each moved for summary judgment. (ECF No. 36; ECF No. 38.) In the following weeks, and well after the close of discovery, Mr. Thomas filed a flurry of discovery-related motions. (ECF No. 39; ECF No. 44; ECF No. 47; ECF No. 49; ECF No. 50; ECF No. 51.) To the extent that the motions can be construed as motions to compel, the Magistrate Judge denied them because of Mr. Thomas's failure to try and confer with Defendants before filing the motions. (Order, Mar. 6, 2026; Order, Mar. 13, 2026; Order, Mar. 27, 2026.) However, in so ruling, the Magistrate Judge noted that to the extent the motions presented arguments related to summary judgment, they would be addressed in ruling on the

parties' motions for summary judgment.  (Order, Mar. 6, 2026).  Accordingly, the Court addresses the motions as necessary.

Additionally, on March 25, 2026, Mr. Thomas filed a supplement to his complaint.  (ECF No. 52.)  In the supplement, Mr. Thomas attempted to join additional parties that were not named in the original complaint.  (ECF No. 52.)  The Magistrate Judge granted a motion to strike that supplement for several reasons.  (Order, Apr. 1, 2026.)  Finally, on April 10, 2026, Mr. Thomas filed a 55-page affidavit and numerous medical records.  (ECF No. 54.)  Defendants moved to strike these documents as disregarding the Court's orders that discovery was closed.  (ECF No. 55.)

Based on this procedural background, two matters remain for the Court to decide: (1) whether the Court can consider Mr. Thomas's affidavit and medical records; and (2) the parties' cross-motions for summary judgment.

## CONSIDERATION OF THE AFFIDAVIT

On April 10, 2026, Mr. Thomas filed an affidavit, which included many medical records.  (ECF No. 54.)  Defendants move to strike the affidavit as improper.  (ECF No. 55.)  In doing so, Defendants argue that, in filing the affidavit, Mr. Thomas ignored the Court's repeated admonishment that discovery in this case is closed and will not be reopened.  (*Id.*, PageID #842.)

To be considered by a court on summary judgment, an affidavit must satisfy three requirements:  it must (1) be made on personal knowledge; (2) set out facts that would be admissible in evidence; and (3) show that the affiant is competent to

testify on the matters stated.  Fed. R. Civ. P. 56(c)(4).  Where an affidavit contains a mix of personal knowledge, which is admissible, and belief, which is not, courts must admit the parts based on personal knowledge as long as that knowledge is distinguishable from belief.  *Ondo v. City of Cleveland*, 795 F.3d 597, 605 (6th Cir. 2015).  If the court cannot tell the difference, then it must strike the entire affidavit. (*Id.*)

To the extent that Mr. Thomas attempts to add new parties and/or claims or to request new or additional discovery, the Court denies those requests and gives the affidavit no consideration.  The deadline to add new parties or to amend the pleadings was October 17, 2025.  (ECF No. 15.)  An amendment after that deadline requires a showing of good cause.  Plaintiff fails to make such a showing, and the Court discerns no good cause on this record to allow a belated amendment.  The deadline for discovery was December 31, 2025.  (*Id.*)  As the Court repeatedly stated, it will not reopen discovery in this case.  Therefore, Mr. Thomas's attempt to, once again, reopen discovery after he had ample opportunity to participate in discovery and the workup of the case is improper.  In any event, the discovery sought does not bear on the pending cross-motions for summary judgment.

That eliminates much of the affidavit.  For example, pages three to fourteen appear to request additional video footage and medical records.  (ECF No. 54, PageID #789–800.)  Pages twenty and twenty-one contain what appear to be signed witness statements.  (*Id.*, PageID #807–08.)  And page thirty-one appears to attempt to add

12

parties not named in the original complaint. (*Id.*, PageID #817.)  Accordingly, the Court will not consider these aspects of the affidavit.

That leaves the remainder of the affidavit, which contains a mix of Mr. Thomas's personal knowledge and belief. (*See generally id.*)  For example, on page twenty-two of the affidavit, Mr. Thomas states that Officer Kuntz knew he was sick and "denied me medical treatment which allowed my throat infection to get so severe, which led me to getting admitted into the ER at MetroHealth." (*Id.*, PageID #808.)  This claim is only one of many that blurs the line between personal knowledge and belief. *Ondo*, 795 F.3d at 605.  But such claims in an affidavit are improper. *Id.*  On this record, attempting to differentiate between the two is not possible or practicable. *Id.*  Because the Court cannot distinguish between Mr. Thomas's personal knowledge and his belief throughout the remainder of the affidavit, the Court disregards these portions of the affidavit.

However, the one item that the Court can differentiate involves the medical records that Mr. Thomas included with his affidavit. (*See* ECF No. 54-1, PageID #837.)  If otherwise admissible, and the Court treats them as such, those records are proper evidence on summary judgment.  Indeed, both parties rely on medical records in establishing the facts, and Defendants also submitted medical records.  Accordingly, the Court will consider the medical records in ruling on the parties' cross motions for summary judgment.

## ANALYSIS

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movement is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party. *Kirilenko-Ison v. Board of Educ. of Danville Indep. Schs.*, 974 F.3d 652, 660 (6th Cir. 2020) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The Court's function at this stage is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "The party seeking summary judgment has the initial burden of informing the court of the basis for its motion" and identifying the portions of the record "which it believes demonstrate the absence of a genuine issue of material fact." *Tokmenko*, 488 F. Supp. 3d at 576 (citing *Celotex Corp.*, 477 U.S. at 322). Then, the nonmoving party must "set forth specific facts showing there is a genuine issue for trial." *Id.* (citing *Anderson*, 477 U.S. at 250). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than show there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586.

"[W]here, as here, the parties filed cross-motions for summary judgment, 'the court must evaluate each party's motion on its own merits, taking care in each

14

instance to draw all reasonable inferences against the party whose motion is under consideration." *McKay v. Federspiel*, 823 F.3d 862, 866 (6th Cir. 2016) (quoting *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991)).  Therefore, cross-motions for summary judgement do not warrant granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed.  *Langston v. Charter Twp. of Redford*, 623 F. App'x 749, 755 (6th Cir. 2015).

## I.      Exhaustion

In moving for summary judgment, Defendants argue that Mr. Thomas failed to exhaust his administrative remedies as the Prison Litigation Reform Act of 1996 requires.  (ECF No. 36, PageID #466–70; ECF No. 41, PageID #601–02.)  Defendants argue that Plaintiff's failure to exhaust his administrative remedies before bringing the suit suffices to grant summary judgment in their favor.  (ECF No. 36, PageID #466–70.)

### I.A.   The Prison Reform Litigation Act

Under the Prison Litigation Reform Act of 1996, a prisoner may not bring an action "with respect to prison conditions under section 1983 . . . until such administrative procedures as are available are exhausted."  42 U.S.C. § 1997e(a); *see also Surles v. Andison*, 678 F.3d 452, 455 (6th Cir. 2012).  Complete exhaustion is a mandatory requirement, meaning failure to exhaust cannot be excused, even under special circumstances.  *Ross v. Blake*, 578 U.S. 632, 638–39 (2016) (citing *Woodford v. Ngo*, 548 U.S. 81, 85 (2006); *Jones v. Bock*, 549 U.S. 199, 211 (2007)); *see also Porter v. Nussle*, 534 U.S. 516, 532 (2002) (holding that the "PLRA's exhaustion requirement

15

applies to all inmate suits about prison life" including "whether they allege excessive force or some other wrong"). Even if the administrative process does not provide the monetary relief an inmate seeks, the inmate must first pursue all available administrative remedies before initiating suit. *Porter*, 534 U.S. at 524.

However, the Act does not provide a uniform exhaustion standard. Instead, the inmate's correctional institution defines the applicable administrative rules and procedures. *Jones*, 549 U.S. at 218. To comply with the exhaustion requirement, an inmate must "take advantage of each step the prison holds out for resolving the claim internally and by following critical procedural rules of the prison's grievance process." *Lamb v. Kendrick*, 52 F.4th 286, 292 (6th Cir. 2022) (cleaned up); *see also Woodford*, 548 U.S. at 90–91. Compliance with these rules and procedures is required "even if the prisoner subjectively believes the remedy is not available, . . . even when the state cannot grant the particular relief requested, . . . and 'even where [the prisoners] believe the procedure to be ineffectual or futile.'" *Napier v. Laurel Cnty., Ky.*, 636 F.3d 218, 222 (6th Cir. 2011) (citations omitted). Further, "an inmate cannot simply fail to file a grievance or abandon the process before completion and claim that he has exhausted his remedies." *Hartsfield v. Vidor*, 199 F.3d 305, 309 (6th Cir. 1999) (citing *Wright v. Morris*, 111 F.3d 414, 417 n.3 (6th Cir. 1997)).

Failure to exhaust is an affirmative defense, meaning "inmates are not required to specially plead or demonstrate exhaustion in their complaints." *Jones*, 549 U.S. at 216. Instead, if an inmate fails to exhaust, the defendants may raise exhaustion as an affirmative defense on which they bear the burden of proof. *Lamb*,

16

52 F.4th at 295 (quoting *Surles*, 678 F.3d at 457 n.10).  "[J]udges may resolve factual disputes relevant to the exhaustion issue without the participation of a jury." *Lee v. Willey*, 789 F.3d 673, 677–78 (6th Cir. 2016) (citations omitted).

"Although the PLRA's exhaustion requirement is strictly construed, the statute 'contains its own, textual exception to mandatory exhaustion' that applies when remedies are not 'available.'" *Lamb*, 52 F.4th at 292 (quoting Ross, 578 U.S. at 642).  The statute expressly forecloses a federal action "until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  An administrative remedy is not available within the meaning of the statute to inmates and not subject to the exhaustion requirement where: (1) the administrative grievance procedure "operates as a simple dead end"; (2) the administrative grievance procedure is "so opaque that it becomes, practically speaking, incapable of use"; or (3) "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Ross*, 578 U.S. at 643–44.

### I.B.    The Cuyahoga County Jail's Grievance Process

To determine whether Mr. Thomas exhausted his administrative remedies under the Prison Litigation Reform Act, the Court examines the Cuyahoga County jail's grievance process. *Lamb*, 52 F.4th at 292.  To do so, the Court relies on the jail's inmate handbook, which details the grievance process.  (ECF No. 32-3.)  Under that policy, inmates, like Mr. Thomas, can submit grievances, to which designated jail staff respond.  (ECF No. 30-1, PageID #239 & #244.)  When submitting a grievance, the inmate must include the date of the incident underlying the grievance and ensure that each grievance concerns only a single incident.  (ECF No. 32, PageID #302.)

17

Generally, once a detainee receives a response to the grievance, the detainee has three options:  (1) accept the response; (2)  accept the response with objections; or (3) appeal the response.  (*Id.*, PageID #243.)  If a detainee does not appeal the response, then the grievance is considered resolved.  (ECF No. 32; ECF No. 32-1; ECF No. 32-3.)

Depending on the type of grievance the inmate has; the handbook contains two separate processes—one for healthcare related complaints and another for non-healthcare related complaints.  (ECF No. 32-3, PageID #329–30; *Id.*, PageID #339–41.)  To file a healthcare related grievance, an inmate must follow four steps. First, the inmate must send an "Inmate Request Form" to the medical department to try to resolve his concerns.  (*Id.*, PageID #329.)  Second, if the inmate is not satisfied with the medical staff's answer, the inmate may request a medical grievance form from the medication cart nurse, who visits inmates' cells to dispense medicine.  (*Id.*) Third, if the inmate is not satisfied with the response to that grievance, the inmate may then appeal the response in writing. (*Id.*)  Fourth, if an inmate is still unsatisfied with the second response, the inmate can file a grievance with the box checked for "Committee Review," triggering review by the MetroHealth Grievance Committee. (*Id.*, PageID #330.)  The Committee's response is final.  (*Id.*)

The general grievance process is more straightforward.  An inmate may submit a grievance through the digital Securus ConnectUs Platform using either a tablet or a kiosk located in each housing unit.  (*Id.*, PageID #339.)  Corrections staff must respond within twenty-one days.  (*Id.*, PageID #340.)   If the inmate is not satisfied with the response, then the inmate may appeal the issue to the jail administrator or

18

his designee within seven days of receiving the response. (*Id.*) Then, the administrator has fourteen days to respond with a final decision. (*Id.*)

### I.C. Exhaustion of Administrative Remedies

Plaintiff filed a mix of healthcare-related and general grievances for the two incidents in question. (ECF No. 32-5, PageID #365–66.) The Court addresses whether Plaintiff properly exhausted each type of grievance in turn.

### I.C.1. Healthcare-Related Grievances

Plaintiff filed eleven grievances using the inmate healthcare grievance form related to his medical concerns. (*Id.*) These eleven grievances timely received responses, and all responses were either passively or actively accepted. (*Id.*) There is no indication in the record that Mr. Thomas appealed these responses. (*See* ECF No. 32-4, PageID #346–64.) By not appealing these grievances, Plaintiff failed to exhaust his grievances. *See Hartsfield*, 199 F.3d at 309 (6th Cir. 1999) (citing *Wright*, 111 F.3d at 417 n.3). Accordingly, Plaintiff did not exhaust all available administrative remedies before bringing suit.

Plaintiff filed a twelfth medical grievance. Instead of using the healthcare grievance form, he filed it following the general grievance procedure. (ECF No. 32-4, PageID #359.) He received a reply from corrections staff two days after filing this grievance, informing him that his concerns were directed to nursing management. (*Id.*) Plaintiff appealed this response and received a reply within three days. (*Id.*) However, there is no indication that Plaintiff further appealed this response as required under the general grievance process. Nonetheless, Plaintiff filed this grievance using the wrong procedure, as the inmate handbook makes clear. (ECF

19

No. 32-4, PageID #359; *see* ECF No. 32-3, PageID #329–30.)  Accordingly, Mr. Thomas failed to exhaust his administrative remedies.  *See Woodford*, 548 U.S. at 90–91 (holding proper exhaustion requires compliance with all procedural rules).

Overall, Plaintiff did not properly appeal his healthcare grievances as the procedures outlined in the inmate handbook require.  Indeed, Mr. Thomas never went past step one in the healthcare grievance process—he only submitted the grievances (excluding the improperly filed healthcare grievance using the general grievance process) using the inmate healthcare grievance form.  He did not even attempt to follow the remaining processes to appeal these grievances and receive a final response.  Accordingly, Mr. Thomas did not exhaust his administrative remedies with respect to his medical concerns.

### I.C.2. Lost Property Grievance

Plaintiff filed three general grievances related to his lost property.  (ECF No. 32-4, PageID #350, #352, & #356.)  The first, filed the same day as his assault on November 2, 2024, never received a response from corrections staff.  (ECF No. 32-4, PageID #350; ECF No. 32-5, PageID #366.)  While this is a violation of the process set forth by the grievance procedure, Plaintiff failed timely to object as the procedure requires.  (ECF No. 32-3, PageID #339–40.)  Five days later, he filed a second grievance requesting reimbursement for the lost items.  (ECF No. 32-4, PageID #352.)  Similarly, Mr. Thomas did not receive a response to his second grievance.  (*Id.*)  Again, while this is a violation of the grievance process by corrections staff, Mr. Thomas did not file an appeal for this violation until well over a year later.  (*Id.*; ECF No. 32-5, PageID #339–40.)

Third, Plaintiff filed general grievance requesting the identity of staff the who were working while Mr. Thomas was treated at the hospital for his tonsil draining. (ECF No. 32-4, PageID #356.)  Corrections staff responded asking if Plaintiff had spoken to a corporal.  (*Id.*).  Plaintiff accepted this response and, once again, did not appeal this grievance.  (*Id.*)  By not timely objecting to the grievances or appealing the responses, Plaintiff did not comply with all the procedural rules of the grievance process as required.  *See Woodford*, 548 U.S. at 90–91.  Accordingly, he failed to exhaust his administrative remedies.

Additionally, Plaintiff's three general grievances all related to lost property (ECF No. 32-4, PageID #350, #352 & #356.)  But the grievance procedure only allows for an inmate to file one grievance related to a single incident.  (ECF No. 32-2, PageID #340.)  By filing multiple grievances related to the same underlying incident, he did not follow the grievance process.  And by not following the required grievance process, Plaintiff did not properly exhaust his administrative remedies.  *See Woodford*, 548 U.S. at 90–91.

### I.C.3. Exceptions to Exhausation

Plaintiff cannot argue that the grievance procedure was not available to him. *Ross*, 578 U.S. at 643–44.  First, Plaintiff cannot claim that the appeal process was simply a dead end; he was able to file grievances and appeals and, except for the general grievances he did not appeal, corrections staff timely responded.  (*See* ECF No. 32-4.)  Second, the grievance process is not so opaque that it cannot be used. Rather, the inmate handbook, which Mr. Thomas acknowledges he received and understood, lays out the process that an inmate must follow to exhaust a grievance.

21

(ECF No. 32-1; ECF No. 30-1, PageID #244.) Further, Mr. Thomas had the medical grievance process explicitly explained to him by medical staff. (ECF No. 30-1, PageID #245.) Third, Plaintiff presents no evidence that corrections staff thwarted his use of the process. Again, Plaintiff filed many grievances, received responses, and filed several appeals. (ECF No. 32-4.) Nothing in the record suggests that there were "machinations" or "misrepresentations" by corrections staff. Indeed, Plaintiff chose not to exhaust the grievance process and either accept responses or abandon the appellate process.

*   *   *

For these reasons, the Court determines that Plaintiff failed to exhaust his administrative remedies. It is unclear whether Plaintiff's claims that there was black mold near his cell, his food was poisoned, and the water in the correctional facility was contaminated constitute healthcare-related or general grievances. Whatever the case, the record leaves no doubt that Plaintiff failed to exhaust his administrative remedies with respect to these claims. Accordingly, the Court **GRANTS** Defendants' motion for summary judgment on Plaintiff's federal claims.

## II. State-Law Claims

Because the Court determines that Plaintiff failed to exhaust his administrative remedies for his federal claims, the Court considers whether it has jurisdiction over Plaintiff's remaining State-law claims for violations of Sections 2921.44 and 2921.44 of the Ohio Revised Code. (ECF No. 1, PageID #16.)

Under federal law, "the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original

22

jurisdiction that they form part of the same case or controversy under Article III." 28 U.S.C. § 1367(a). This grant of jurisdiction brings all claims arising from a common nucleus of operative fact before the Court. *Soehnlen v. Fleet Owners Ins. Fund*, 844 F.3d 576, 588 (6th Cir. 2016). Even then, a court "may decline to exercise supplemental jurisdiction" in certain circumstances. 28 U.S.C. § 1367(c). Supplemental jurisdiction "is a doctrine of discretion." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966). To determine whether to exercise supplemental jurisdiction, "a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity[.]" *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988); *see also James v. Hampton*, 592 F. App'x 449, 462–63 (6th Cir. 2015) (quoting *Landefeld v. Marion Gen. Hosp., Inc.*, 994 F.2d 1178, 1882 (6th Cir. 1993)). Pursuant to Section 1367, the Court "may decline to exercise supplemental jurisdiction over a claim . . . if . . . [it] has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3).

Because the Court dismisses all claims over which it has original jurisdiction, it declines to exercise supplemental jurisdiction over Plaintiff's State-law claims. Indeed, because the Court decided this case on exhaustion grounds, it did not assess the merits of Plaintiff's claims. Therefore, the local courts are better positioned to interpret and analyze the State-law claims in the first instance. Accordingly, the Court **DENIES WITHOUT PREJUDICE** Defendants' summary judgment motion on Plaintiff's State-law claims.

23

## CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' motion to strike Plaintiff's affidavit (ECF No. 55), **GRANTS IN PART** Defendants' motion for summary judgement (ECF No. 36) and **DENIES** Plaintiff's motion for summary judgment (ECF No. 38).  Further, the Court **DISMISSES WITHOUT PREJUDICE** Plaintiff's State-law claims.

**SO ORDERED.**

Dated:  August 10, 2026

J. Philip Calabrese
United States District Judge
Northern District of Ohio

24